[Civ. No. 1953. Third Appellate District.—March 18, 1919.]

GEORGE D. RICHEY, Respondent, v. JAMES A. BUTLER et al., Defendants; M. D. BUTLER, as Administrator, etc., Appellant.

[1] EVIDENCE — UNCONTRADICTED TESTIMONY—IMPEACHMENT—WEIGHT. A trial court is not legally bound to accept all testimony adduced before it at its face value, or as conclusive, merely because there is no testimony offered and received in contradiction of it. The manner in which a witness may testify often operates as effectually in the impeachment of the verity of his testimony as would affirmative contradiction thereof by other testimony.

[2] ID.—QUESTIONS OF FACT—TESTS AVAILABLE—APPEAL—REVIEW.— The tests available to trial judges and juries for determining questions of fact are obviously not available to reviewing tribunals, and, therefore, when a trial court or jury reaches a conclusion upon the facts, such conclusion is rarely reviewable, and only so when the questions of fact are of such a character from the nature of the evidence as to resolve them into questions of law.

[3] ID.—ACTION TO FORECLOSE MORTGAGE—FRAUD AS DEFENSE—REJECTION OF DEFENDANT'S TESTIMONY—DISCRETION.—In this action to foreclose a purchase-money mortgage, the only evidence offered in support of a special defense of fraud in the concealment of the existence of a prior mortgage having been the testimony of the defendant, the situation was not such as to warrant the appellate court in saying that the trial court committed error or an abuse of sound judicial discretion in refusing to accept the defendant's story.

APPEAL from a judgment of the Superior Court of Sacramento County. Peter J. Shields, Judge. Affirmed.

The facts are stated in the opinion of the court.

Paul F. Fratessa and Edward I. Butler for Appellant.

Thomas B. Leeper for Respondent.

HART, J.—The action was brought to foreclose a mortgage on 80 acres of land in Sacramento County, which was given to secure the payment of a promissory note for one thousand five hundred dollars, executed by James A. Butler and payable to the order of Joseph Roffy, which note and mortgage,

at the commencement of the action, were alleged to be the property of the plaintiff.

A decree was entered, ordering foreclosure of said mortgage, the sale of the mortgaged property and the payment to plaintiff of one thousand five hundred dollars and interest from the proceeds of the sale. It was also decreed that said sale should be subject to an assessment lien of defendant, Reclamation District 1000, and that plaintiff take nothing as against said Reclamation District.

The appeal is by M. D. Butler, administrator, from the judgment. A reversal is urged upon the sole ground that the findings and the judgment are not supported by the evidence.

The note and mortgage in question were dated March 3, 1908, and the mortgage was acknowledged by James A. Butler on the sixteenth day of the same month. James A. Butler died February 22, 1913, and M. D. Butler was duly appointed administrator of his estate and substituted in the action, and will hereinafter be called the defendant.

It appeared that on October 26, 1907, said Roffy had executed a mortgage in favor of George L. Woodford, but at the date of the trial belonging to James H. Davidson, to secure the sum of one thousand five hundred dollars, said mortgage covering 160 acres of land, of which the 80 acres in question were a part. It was alleged in the answer: "That the said Roffy, with the intent to deceive and defraud said James A. Butler, falsely, fraudulently, and knowingly represented to said James A. Butler that said land was then free and clear from any and all liens and encumbrances," and that James A. Butler did not discover said encumbrance until in the month of April, 1908, at which time he demanded of Roffy the cancellation of the Butler note and mortgage, which was by Roffy refused. Before the trial, plaintiff dismissed the action as to defendant Davidson, who had commenced an action to foreclose his mortgage. As to this, the court found that nothing was due on the Davidson mortgage "and said mortgage constitutes no lien or encumbrance upon said land and the existence of said mortgage constitutes no fraud or deceit upon the mortgagor in said action, and said defendant Butler was not damaged and suffered no damage by reason of said alleged mortgage."

The plaintiff having introduced in evidence, the note and the mortgage sued upon and certain written assignments showing that he was the owner thereof and thereupon rested his case, a showing was then made to justify findings sufficient to support the decree. The single question remaining, then, is: Is the evidence presented by the defendant and addressed to the special defense set up in the answer and based upon the ground of fraud such that this court may justly declare that the trial court, in repudiating or disregarding it, abused its discretion or transcended the province (peculiarly that of trial courts) of passing upon questions of the credibility of the witnesses and the weight of the evidence?

The only testimony offered by the defendant and received by the court in support of the special defense was that given by the defendant himself. He testified that he met Joseph T. Roffy in San Rafael at the time the mortgage was executed by his brother to him; that his brother, since deceased, Mr. Roffy and the witness were present; that he met his brother and Mr. Roffy at their request; that they wanted him to look at some papers which they were about to execute. He continued: "They told me that Mr. Roffy was the owner of some land up in Sacramento County and that he was about to trade the land for an automobile that my brother then owned. The automobile was valued by both Roffy and my brother at $1,500. The land was valued by both Roffy and my brother at $3,000. They agreed to make the trade—the automobile for the land, with a mortgage back of the $1,500 on the balance due on the purchase price. They both asked me to look over the papers, which I did. I then informed them both that the transaction was not carried on in a business way, that they should have an abstract of title—search of the title made. Mr. Roffy informed my brother at that time that such a thing would be a needless expense, that he had just had the title searched himself, had the abstract at his place, that he would produce that abstract and would transfer it to my brother, . . . and assured my brother that the land was clear and free of any kind of encumbrance or lien, the title was perfect. . . . My brother said he knew Mr. Roffy for some time; that he was a teacher in the University of California, that he had every faith in him, that it would be a whole lot of red tape and a needless expense to have any search made; that he was perfectly willing to take the statement of Mr.

Roffy that the land was free and clear from any encumbrance.'' The witness said that so far as he knew his brother never saw an abstract; that about three months later he and his brother visited·an attorney who was representing Roffy and that. his brother said he wanted his automobile back, and would reconvey the property to Roffy as soon as the note and mortgage were delivered up and canceled. Shortly after that, witness and his brother saw Roffy in San Francisco. He said: "My brother demanded from·Mr. Roffy that he deliver back the automobile to him. Mr. Roffy made promises of freeing the land from the encumbrance which was upon it. My brother became a little impatient and told Mr. Roffy that he was tired of waiting, that he had been stalling for two or three months and that he had lost faith in him; that he would wait no longer. . . . I prepared a complaint at that time setting up the fraud and asked for an injunction to prevent Roffy from transferring the automobile or further using it or damaging it and also praying that the note and mortgage be delivered up and canceled. Before that complaint had been verified by my brother or before it had been filed, my brother informed me that Mr. Roffy had disposed of the automobile and that he was unable to. locate it.'' Thereupon, he testified, his brother swore to a complaint charging Roffy with obtaining money under false pretenses and a warrant issued for his arrest, but Roffy had gone to Chicago and the warrant was not served.

It will be noted that it does not clearly appear from the witness' testimony that the deceased never at any time, prior to the consummation of the sale, saw and examined the abstract of title to the land which Roffy said that he had and which he further said he would produce and deliver to the deceased. But, be that as it may, it is, of course, manifest that the court rejected the defendant's testimony, and we can perceive no reason arising from the record before us for declaring, as a matter of law, that the refusal of the court to accept that testimony involved error or an abuse of judicial discretion. Indeed, as we view the proposition, it would be entirely in excess of the just power of a reviewing court to hold that it was the legal *duty* of the trial court to have accepted as verity the testimony of the defendant and upon it predicated a finding that the transaction resulting in the sale of the land to the deceased by Roffy was characterized by such

fraud and deception as would, in equity, vitiate such a transaction.

[1] A trial court is not legally bound to accept all testimony adduced before it at its face value or as conclusive, merely because there is no testimony offered and received in contradiction of it. The manner in which a witness may testify often operates as effectually in the impeachment of the verity of his testimony as would affirmative contradiction thereof by other testimony. The trial court has the witnesses before it and is thus in a position to determine, with at least approximate accuracy, whether a witness' testimony is or is not worthy of that degree of credence necessary to impress it with persuasive or any probative force. [2] The tests available to trial judges and juries for determining questions of fact are obviously not available to reviewing tribunals, and, therefore, when a trial court or jury reach a conclusion upon the facts, such conclusion is rarely reviewable, and only so when the questions of fact are of such a character from the nature of the evidence as to resolve them into questions of law.

[3] In the present case, the trial court acted clearly within its province in refusing to accept the defendant's story, and, as suggested, the situation here is not such as to warrant us in saying that thus it committed error or an abuse of sound judicial discretion.

But the trial court was not required to determine the question whether there was fraud in the transaction on the part of Roffy sufficient to render it nugatory and void by a consideration alone of the defendant's testimony. The plaintiff, in rebuttal, introduced in evidence a number of letters passing between the plaintiff and James A. Butler long after the sale and conveyance of the land to the latter and the mortgage by him given to Roffy on said land to secure payment of his (Butler's) promissory note to Roffy for the purchase price. The contents of the deceased's letters, which formed a part of the correspondence referred to, the trial court could well have considered as rather contradictory to, than confirmatory of, the testimony of M. D. Butler. The subjoined is the important part of said correspondence:

On January 30, 1909, said Butler wrote to plaintiff, saying, among other things: "I am going to try and settle up with

Geo. Woodford regarding the Sacramento land some time, this week, and would like to communicate with you when I do.''

To this letter, plaintiff replied on February 4, 1909, as follows: ''Not having heard from you in answer to my two previous letters, I was about ready to start foreclosure on the $1,500 mortgage, signed by you, which I hold against the land near Sacramento. You say you are going to settle up with Woodford this week. Woodford's mortgage is not due for nearly a year yet, while my mortgage was due on Jan. 1st. If you do not care to pay my mortgage and want to get released from the note, I am willing to release you, providing you give me a quit-claim deed to your 80 acres, so that I can clear up the title. If you want to pay the mortgage off and keep the land, and have not all of the cash at this time, I will be willing to accept part of it and wait a short time for the balance. I am willing to do anything that is fair, but something must be done right away. . . . ''

On February 9, 1909, Butler answered, saying that he had not received the two letters mentioned by plaintiff, and proceeding: ''I was over to see Mr. Woodford today and told him that I was willing to settle with him or you. But that I would like to hear from you first which I think is proper. You say his mortgage will not be due for some time. Now your mortgage is over due and perhaps it would be better to settle with you and you can setttle the difference. I now have a check for $1,000 and will pay Mr. Woodford or you providing things can be arranged. I will be able to pay the balance in a month or so. . . . ''

Plaintiff replied on February 19, 1909, stating that he had nothing to do with Woodford's mortgage; that he would send the note and mortgage to the Wells-Fargo Bank, in San Francisco, to be indorsed by the bank upon receipt of one thousand dollars.

On February 24th, Butler wrote: ''I am going to deposit $1,000 this day with the Wells Fargo Bank here in this city. I will instruct them to send you this amount upon receipt of the Release & Mortgage. I will pay you the balance in three or four months. Kindly let me know what rate of interest you intend to charge. I am willing to pay anything that is fair and square.''

Later, on the same day, he wrote that the Wells-Fargo Bank refused to accept the money, as plaintiff had no account with

it, but that he had deposited the money with the Anglo-Californian Bank "and if you send your papers to them they will hold them in escrow until your mortgage is satisfied."

Plaintiff, on March 2, 1909, wrote that he was sending the note and mortgage to the Anglo-Californian Bank. He said: "You state that the bank would hold the papers in escrow until the mortgage was all satisfied. This will hardly be necessary, and I would prefer to hold the papers until the balance becomes due. I have drawn an extension agreement, which is signed by myself and acknowledged before a notary public. This I have instructed the bank to deliver to you when you turn over the $1,000 to them for me. . . . You asked me about the rate of interest on the $500. I am willing to let it go without interest now that the matter is being settled." The extension agreement referred to in the above letter was to the effect that upon payment of one thousand dollars upon said note and mortgage, payment of the balance of five hundred dollars would be extended to July 1, 1909.

On July 7, 1909, J. A. Butler wrote plaintiff: "Your letter has been received and noted. Let me assure you that I will settle with you in sight of ten days. My money got tied up, otherwise I would have settled before now. Assuring you that I am about to pay you up," etc.

The above letters of the deceased very plainly show that, if he at any time ever believed that Roffy had imposed upon or deceived him as to the title to the land, he must have later satisfied himself that the bargain was all that he could have expected it to be. In none of the letters, it will be noted, did he make any complaint about the transaction or claim that he was induced to enter into and consummate it by any misrepresentations or deception on the part of Roffy. To the contrary, the letters very clearly show that he was anxious to pay his mortgage debt and so retain the land, notwithstanding that he knew, as the letters show, that a prior mortgage to secure an unmatured indebtedness evidenced by a promissory note then subsisted upon the property. It is quite manifest that upon a consideration of said letters the trial court could justly or at least with considerable reason have been inspired with a strong feeling of distrust in the testimony of the witness, Butler.

While thus we have presented and briefly considered some of the considerations upon which the court below might have

been led to reach its conclusion, in the face of the testimony of the defendant, that the transaction between Roffy and the deceased was carried on and completed, so far as Roffy's part therein was concerned, honestly and in good faith and that the purchase of the land by the deceased was not the result of any misrepresentation by the former of the condition of the title either at the time the transaction was under negotiation or when it was finally completed, it has not, under our view of the record, been absolutely necessary that we should have done so, since, as hitherto declared, there would be, even in the absence of the letters referred to from the record, no justification for the conclusion by this court that the result reached by the court below necessarily involved an arbitrary rejection of the defendant's testimony. In other words, as stated in the beginning, there would be in such case no ground upon which we could justly hold that, by disregarding the testimony of the defendant, the court below was guilty of an abuse of discretion.

In view of the conclusion we have arrived at, as indicated above, it is not necessary to consider other assignments involving attacks upon other findings than those just considered. As stated above, the finding that the note and the mortgage were made and delivered as alleged in the complaint is of itself sufficient to support the judgment, and it therefore becomes wholly immaterial whether the prior mortgage was or was not a subsisting lien upon the land at the time of the transaction between Roffy and the deceased, and the finding that it was not is, therefore, also immaterial. Nor, in view of our conclusion as to the evidence, is it necessary to determine whether, to entitle the defendant to maintain his defense upon the ground of fraud, it was necessary for him to rescind the contract of sale, it being contended by the respondent that rescission is a prerequisite to a right of action in such a case and that the same must be kept alive continuously and to the time of the trial, which, it is likewise contended, was shown by the letters above adverted to was not done.

The judgment appealed from is affirmed.

Buck, P. J., *pro tem.*, and Burnett, J., concurred.